UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| David DeFabiis, derivatively on Behalf of KRAFT HEINZ COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> BERNARDO HEES, PAULO BASILIO, DAVID KNOPF, GEORGE ZOGHBI, 3G CAPITAL INC., 3G GLOBAL FOOD HOLDINGS, LP, 3G CAPITAL PARTNERS II LP, 3G CAPITAL PARTNERS, LTD., HK 318 LP, ALEXANDRE BEHRING, JOHN T. CAHILL, GREGORY ABEL, TRACY BRITT COOL, FEROZ DEWAN, JEANNE P. JACKSON, JORGE PAULO LEMANN, JOHN C. POPE, MARCEL HERRMANN TELLES, ALEXANDRE VAN DAMME and GEORGE ZOGHBI, <br><br> Defendants, <br><br> and <br><br> KRAFT HEINZ COMPANY, <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff David DeFabiis, derivatively, on behalf of Kraft Heinz Company, alleges the following based upon information and belief as to the investigation conducted by Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Kraft Heinz Company ("Kraft Heinz" or the "Company"), securities analyst reports, press releases, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of Kraft Heinz seeking to pursue remedies under the common law and statutory law of Delaware, the Company's state of incorporation and federal securities laws.  The Company's officers and directors breached their common law and statutory fiduciary duties and duties under federal securities laws and allowed insiders to profit thereby.  In addition, the director Defendants' actions and inactions, statements and omissions have caused loss and damage to the Company and threaten the Company with hundreds of million and potentially billions of dollars in liability to investor lawsuits on behalf of open market common stock purchasers and buyers of the Company's $3 billion offering of debt in mid-2018.

2.    On February 21, 2019, after the stock market closed, Kraft Heinz announced that it had to write off more than 20% of its $44 million dollars in goodwill through an impairment charge to its U.S. Refrigerated and Canada retail reporting units and an additional write down of more than 20% of the carrying amounts of certain intangible assets, including the Company's Kraft and Oscar Mayer trademarks.  The total impairment charges resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34 for the annual period ended December 31, 2018.  The loss, and Kraft Heinz's excessive debt loan relative to assets and earnings potential, pressured Kraft Heinz into a 36% reduction of its quarterly dividend from the $0.625 quarterly dividend Kraft Heinz had been paying to .04 per share.  The decrease was designed to save the company $1 billion a year to help reduce long-term debt of $30.9 billion.

3.    At the same time, the Company publicly disclosed for the first time that Kraft Heinz had received a subpoena from the SEC in October 2018 in relation to accounting associated with the Company's procurement function.  As a result of the SEC investigation, the

Company conducted its own internal investigation, which resulted in the Company recording a $25 million increase to costs of products sold, damaging the Company's credibility and provoking fears of future accounting adjustments.

4.      As a result of these disclosures, the price of Kraft Heinz common stock declined over 27% from $48.18 per share to $34.95 per share, erasing more than $16 billion of the Company's market capitalization.  Since February 19, 2019 it has traded down to approximately $32 per share.

5.      This sudden and massive write down of the Company's goodwill was foreseen by insiders.  Company officers and directors had known since at least mid-2017 that powerful trends in the retail food and beverage business towards private label brands such as offered by Amazon, Walmart and Costco were (i) undermining sales growth of Company products; (ii) materially weakening the Company's leverage over retailers for shelf space and promotional support; (iii) continuing weakness in the Company's products pricing power was materially changing the competitive landscape for the Company in a permanent way that posed an immediate and future threat to the Company's sales, margins and cash flows from units/products.  As of December 2017, the Company showed $44.8 billion in goodwill on its balance sheet, and a similar amount of "intangible assets" values, much of which was added as a result of the Kraft Heinz merger in 2015.  Goodwill and intangible assets together represented 87% of the Company assets in 2018. As early as May 2017, analysts were questioning the amount of goodwill and intangible assets the Company was carrying.  Defendants knew that Kraft Heinz's declining results throughout 2017 and 2018 were the result of recognized trends in retail food consumer's preferences, buying habits and that the Company's competitive disadvantage versus better positioned competitors reflected a permanent impairment of brand value that should have been recognized earlier.

6.     The director and officer Defendants named herein had a duty to ensure that Kraft Heinz's financial statements and reports were true, accurate, complete and not misleading. These Defendants have known since 2017, if not sooner, that the carrying value of goodwill and intangible assets was impaired and/or at risk from near term material impairment and was thus overstated throughout 2018 and Kraft Heinz stock price was artificially inflated during 2018.

7.     The 3G Defendants, whose founders, partners and owners were key executive officers and directors of Kraft Heinz, took advantage of the artificially inflated price of Kraft Heinz and sold material amounts of Kraft Heinz stock based on material non-public information.

8.     This shareholder derivative action seeks redress against the Company's current and former officers and directors for breaches of their fiduciary duties.  Defendants had a fiduciary duty to act in the Company's best interests, and to actively oversee the Company's operations to identify and prevent unlawful conduct, yet exposed Kraft Heinz to substantial liability by knowingly or recklessly permitting the Company and its employees to issue materially false and misleading financial statements and press releases.  It also seeks to recover, on behalf of Kraft Heinz, the insider trading profits earned by Defendant 3G and its affiliates in 2018.

9.     Demand is excused in this action because a majority of the members of the Company's Board, including those who also served on the Kraft Heinz Board, violated their fiduciary duties, are employed by, associated with, or beholden to, Kraft Heinz and/or 3G Capital, the latter whom controls Kraft Heinz through its ownership stake and representation on Kraft Heinz board of directors.  Other directors are employed by Kraft Heinz's other principal owner and controlling shareholder, Berkshire Hathaway whose CEO, Warren Buffett has committed Berkshire Hathaway to several large co-investments with 3G and has publicly stated his desire for Berkshire Hathaway to do more investments with 3G, and as a result cannot be

independent.  As detailed herein, the Director Defendants remained consciously inactive despite actual or constructive knowledge of issuance of materially false and misleading statements, and failing to implement any meaningful changes to identify and immediately address the issues described herein.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under the laws of the United States and the State of Delaware.  This Court has jurisdiction over the subject matter of this action under its federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has exclusive jurisdiction pursuant to Section 27 of the Securities Exchange Act 15 U.S.C. § 78(aa) because this action asserts claims under Sections 10(b) and 14(a) of the Exchange Act, 15 U.S.C. § 78(n)(a) and this Court also has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367(a).

11.     Venue is proper in this District under 28 U.S.C. § 1391(a) because the Company maintains is principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff David DeFabiis as set forth in the accompanying verification attached hereto is and has been a beneficial owner of Kraft Heinz since before August 2018.

### B.     Nominal Defendant

13.     Nominal Defendant Kraft Heinz is one of the largest food and beverage companies worldwide.  The Company was formed in 2015 when Kraft Foods Group, Inc. ("Kraft") merged with H.J. Heinz Holding Corporation ("Heinz").  The Company maintains its

principal executive officers in Pittsburgh, Pennsylvania and its common stock is listed and trades on the NASDAQ under the ticker symbol "KHC."  As of 2015 and through the present it was controlled by Defendant 3G and Berkshire Hathaway who owned, respectively, 595 million shares and 325 million shares of the Company (constituting over 50% of all voting shares) and who controlled the Company's Board.

### C.   Individual Officer Defendants

14.     Defendant Bernardo Hees ("Hees") is, and as at all relevant times, Kraft Heinz's Chief Executive Officer.  Defendant Hees is a partner of 3G Capital Inc. ("3G Capital").

15.     Defendant Paulo Basilio ("Basilio") served as Kraft Heinz's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") from its formation in July 2015 until October 1, 2017 when he was appointed as the Company's Zone President of U.S business. Defendant Basilio is a partner of 3G Capital.

16.     Defendant David Knopf ("Knopf") joined Kraft Heinz upon its formation in July 2015, initially serving as Vice President of Finance, Head of Global Budget & Business Planning, Zero-Based Budgeting, and Financial & Strategic Planning,  Prior thereto, Defendant Knopf held various roles at 3G Capital from 2013 to 2015.  On October 1, 2017, Defendant Knopf assumed Defendant Basilio's responsibilities when he was appointed as the Company's EVP and CFO.  Defendant Knopf is a partner of 3G Capital.

17.     The foregoing Defendants signed and/or prepared materially misleading annual and quarterly reports of financial statements and registration statements disseminated to the public which inflated the price of Kraft Heinz stock and allowed the sale of a $3 billion bond issue, respectively and has led to shareholder class action lawsuits which threaten Kraft Heinz with billions of dollars of liability.

### D.      Insider Trading Defendants

18.      Defendant 3G Capital ("3G Capital") is a private equity firm specializing in buyout investments in brands and businesses in the retail and consumer sectors.  During the Class Period, Defendant 3G Capital, and its affiliates including 3G Global Food Holdings, L.P. and 3G Capital Ltd., was a controlling shareholder of Kraft Heinz and had access to material adverse non-public information.

19.      Defendants 3G Global Food Holdings, LP, 3G Capital Partners II, LP, 3G Capital Partner, Ltd. and HK 318 LP are all affiliates of Defendant 3G Capital, Inc. who participated in 3G's sales of Kraft Heinz stock in August 2018 and are liable with 3G (collectively the "3G Defendants").

20.      The 3G Defendants sold $1.2 billion in Kraft Heinz stock (over 13% of its investment in Kraft Heinz expressed in dollars), and thereby avoided $600 million in losses when Kraft Heinz stock price collapsed upon disclosure of the write down.

### E.      Individual Director Defendants

21.      Defendant Alexandre Behring ("Behring") was appointed Chairman of The Kraft Heinz Company board of directors effective July 2015 and previously served as Chairman of the Heinz board from June 2013 to July 2015.  Mr. Behring is a co-founder of 3G Capital, a global investment firm, and has been its managing partner and a director since 2004.  He also serves as the Executive Chairman of the Board of Restaurant Brands International, Inc. the parent company of Burger King and Tim Hortons, quick service restaurant companies, since October 2014 and a director of Anheuser-Busch Inbev, a global brewer, since April 2014.  3G maintains significant investments in, and controls, both Restaurant Brands International and InBev. Behring is chair of both the Compensation Committee and Nominating and Corporate Governance Committees.

22.     Defendant George Zoghbi ("Zoghbi") is a director and a full-time paid "Special Advisor" to the Company working with the Kraft Heinz Board of Directors and Defendants Hees and Basilio.  He had served as Kraft Heinz's Chief Operating Officer of U.S. business until October 1, 2017.  In its 2018 Notice of Annual Meeting of Shareholders, Kraft Heinz has admitted that Zoghbi is not "independent."

23.     Defendant John T. Cahill ("Cahill") was appointed Vice Chairman of the Kraft Heinz Company board of directors effective July 2015.  Cahill is currently a paid "consultant" to Kraft Heinz.  In its 2018 Notice of Annual Meeting of Shareholders, Kraft Heinz admitted that Cahill could not meet even the minimal NASDAQ listing standard of "independence." Previously, from December 2014 to July 2015, Mr. Cahill served as Chairman and Chief Executive Officer of Kraft Foods Group.  Mr. Cahill had served as Kraft's non-executive Chairman from March 8, 2014 until his appointment as Chairman and CEO.  Prior to that, he served as Kraft's Executive Chairman since October 1, 2012.  He joined Mondelez International, Inc., a food and beverage company and Kraft's former parent, on January 2, 2012 as the Executive Chairman Designate, North American Grocery, and served in that capacity until the spin-off of Kraft.

24.     Defendant Gregory Abel ("Abel") was appointed to the Kraft Heinz Company board of directors effective July 2015 and previously served on the Heinz board from June 2013 to July 2015.  In January 2018, Mr. Abel was elected to the Board of Directors of Berkshire Hathaway, a diversified holding company, and appointed as its Vice Chairman, Non-Insurance Business Operations.

25.     Defendant Tracy Britt Cool ("Cool") was appointed to the Kraft Heinz Company board of directors effective July 2015 and previously served on the Heinz board from June 2013 to July 2015.  Ms. Cool has served as the Chief Executive Officer of The Pampered Chef (a

Berkshire Hathaway company) a direct seller of high-quality cooking tools, since November 2014.  Ms. Cool joined Berkshire Hathaway, The Pampered Chef's parent company, in December 2009 as Financial Assistant to the Chairman.  Ms. Cool is currently employed by: Benjamin Moore & Co. (a Berkshire Hathaway company), a leading manufacturer and retailer of paints and architectural coatings (since June 2012), Larson-Juhl, (a Berkshire Hathaway company) a manufacturer and distributor of wood and metal framing products (since January 2012), and Oriental Trading Company (a Berkshire Hathaway company), a direct merchant of party suppliers, arts and crafts, toys and novelties (since November 2012).

26.     Defendant Feroz Dewan ("Dewan") was appointed to The Kraft Heinz Company board of directors effective October 2016 and is a member of the Audit Committee.  He is the CEO of Arena Holdings Management LLC, an investment holding company.

27.     Defendant Jeanne P. Jackson ("Jackson") was appointed to The Kraft Company board of directors effective July 2015 and previously served on the Kraft Foods board from October 2012 to July 2015.  She is currently a member of both the Compensation and Nominating and Corporate Governance Committee.  Ms. Jackson is Founder and Chief Executive Officer of MSP Capital, a private equity and investment company.  She currently serves as a director of Delta Airlines, Inc. and McDonald's Corporation and was formerly a director of Motorola Mobility Holdings, Inc.

28.     Defendant Jorge Paulo Lemann ("Lemann") was appointed to The Kraft Heinz Company board of directors effective July 2015 and previously served on the Heinz board from June 2013 to July 2015.  Mr. Lemann is a co-founder of 3G Capital, a global investment firm and has served as a director since 2004.  Mr. Lemann was formerly a director of Anheuser-Busch InBev.  He is a member of both the Compensation Committee and Nominating and Corporate Governance Committee.

29.     Defendant John C. Pope ("Pope") was appointed to The Kraft Heinz Company board of directors effective July 2015 and previously served on the Kraft board from August 2012 to July 2015.  He is the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  Mr. Pope has served as Chairman of PFI Group, LLC, a financial management firm, since 1994.  Mr. Pope also serves as Chairman of the Board of R.R. Donnelley and Sons Co., a printing company, since May 2014; and as a director of Talgo S.A., a railcar manufacturer, since March 2015 and Waste Management, Inc., a provider of comprehensive waste management services, since 1997.

30.     Defendant Marcel Herrmann Telles ("Telles") was appointed to The Kraft Heinz Company board of directors effective July 2015 and previously served on the Heinz board from June 2013 to July 2015.  Mr. Telles is a co-founder of 3G Capital, a global investment firm and has served as a director since 2004.  He also serves as a director of Anheuser-Busch InBev since 2004 and as a director of AmBev, a subsidiary of Anheuser-Busch InBev since 2000.  He is a member of both the Compensation and Nominating and Governance Committees.

31.     Defendant Alexandre Van Damme ("Van Damme") has served as a member of the board of Restaurant Brands International since December 2014.  Van Damme has been publicly described as "close" to 3G's founders.  He previously served on the board of Burger King Worldwide, Inc. and its predecessor from December 2011 to December 2014.  Mr. Van Damme has served as a member of the board of directors of Anheuser-Busch InBev since 1992 which 3G also control through Board designees and their 22.6% ownership state.  He held various operational positions within Interbrew, a large Belgian-based brewing company until 1991.  Mr. Van Damme is also a board member of Jacobs Douwe Egberts B.V., a global coffee and tea company, and its subsidiary Keurig Green Mountain.

10

32. Because of the Individual Defendants' executive and directors positions, they each had access to the undisclosed material adverse information about Kraft Heinz's business, operations, products, operational trends, controls, brands, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof.

**F.      Duties Owned By The Director And Officer Defendants**

33. Defendants, who are officers and/or directors of Kraft Heinz, owed the Company and its shareholders the highest fiduciary duties. These duties are expressed in the law, in the Company's bylaws, articles of incorporation, director committee charters and company codes of conduct issued by the Company expressing its policies and procedures.

34. Because of their positions of control and authority as directors and/or officers of Kraft Heinz, the director and officer Defendants were able to and did, directly and/or indirectly, exercise control over the financial statements and periodic reports issued by Kraft Heinz in 2017 and 2018. By reasons of their positions as officers and/or directors and fiduciaries and because of their ability to control the business and corporate affairs of Kraft Heinz, the director and officer Defendants owe Kraft Heinz and the Company's stockholders the fiduciary obligations of trust, loyalty, good faith, candor and due care, and were required to do their utmost to control and manage the affairs of Kraft Heinz in a fair, just, honest and equitable manner. The Defendants were required to act solely in furtherance of the best interests of Kraft Heinz and the Company's stockholders so as to benefit all stockholders equally, and not in furtherance of their own personal interests or benefit or of the controlling shareholders.

35. Each officer and director owes Kraft Heinz and the Company's stockholders the fiduciary duty to exercise good faith and diligence in the administration of Kraft Heinz's affairs

and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officer and/or directors of a publicly held company, these Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, performance, products, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

36.    The Officer Defendants also had a duty to promptly and accurately report information to the Board and its Committees.

37.    Because of their advisory, executive, managerial and directorial positions, each of the director and officer Defendants had access to material, non-public information about Kraft Heinz, financial condition, operations and in particular the steady erosion of brand value being experienced by Kraft Heinz.

38.    To discharge their duties, the officers and directors of Kraft Heinz were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of the Company.

39.    As officers and directors and controlling persons of a publicly-held company whose common stock is registered with the SEC pursuant to the Exchange  Act and trades on the NASDAQ, which  is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, products, markets, management,  controls, brands, sales and cost trends and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  Defendants' false and

misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

40.    Defendants Dewan, Pope and Jackson as the members of Kraft Heinz s Audit Committee had the following specific duties among others, as set forth in Kraft Heinz's Audit Committee Charter:

> **Purpose**.
>
> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of The Kraft Heinz Company ("Kraft Heinz" or the "Company") will oversee Kraft Heinz's accounting and financial reporting processes, and audits of its financial statements.  In addition, the Committee will assist the Board in its oversight of:
>
> 1. The integrity of Kraft Heinz's financial statements and Kraft Heinz's accounting and financial reporting processes and systems of internal control over financial reporting and safeguarding Company assets;
>
> 2. Kraft Heinz's compliance with legal and regulatory requirements;
>
>    . . .
>
> 3. The performance of Kraft Heinz's internal auditors and internal audit function;
>
> 4. Kraft Heinz's financial matters and financial strategy; and
>
> 5. Kraft Heinz's guidelines and policies with respect to risk assessment and risk management.
>
>    . . . .
>
> **Authority and Responsibilities**.
>
>    . . . .
>
> 5. <u>Earnings Guidance</u>.  The committee will review and discuss earnings press releases and will generally discuss the type and presentation of (a) information to be included in earnings press releases (in particular any

use of "pro forma" or "adjusted" non-GAAP information) and (b) financial information and earnings guidance provided to analysts and rating agencies.

B.    Compliance with Legal and Regulatory Requirements

1.  Risk Assessment.  The Committee will review an discuss Kraft Heinz's guidelines and policies with respect to risk assessment and risk management, including Kraft Heinz's major financial risk exposures and the steps that have been taken to monitor and control such exposures.

2.  Compliance Program.  At lease annually, the Committee will meet with Kraft Heinz's General Counsel, Chief Compliance Officer or similar officer to review (a) the application and administration of all director and employee codes of conduct and ethics adopted by Kraft Heinz's (collectively, the "Codes") and the procedures for identifying, pursuing and investigating any alleged violation of the Codes, and (b) the implementation and effectiveness of Kraft Heinz's programs and strategies designed to foster compliance with the Codes.  As necessary, the committee will review and make determinations on exceptions to the Codes and discuss actual and alleged violations of the Codes with the General Counsel, Chief Compliance officer or similar officer.  The General Counsel and Chief Compliance Officer or similar officer will have the authority to communicate directly to the Committee about actual and alleged violations of the Codes, including any matters involving criminal or potential criminal conduct.

41.    The nature of the material adverse events and conditions announced by Kraft Heinz on February 19, 2019 all fell within the ambit of the Audit Committee's assigned duties and responsibilities.

42.    All directors were expected to adhere to the following Code of Conduct which they were required to sign and affirm, which included, in part:

**Conflicts of Interest**

Maintaining its loyalty to the Company, avoiding any situations that create or appear to create a conflict of interest and providing notice to the Chair of any actual or apparent conflict of interest.

. . . .

**Corporate Opportunity**

Refraining from using the Company's property, information or position for personal gain.

. . . .

**Proprietary Information**

Maintaining the confidentiality of the Company's proprietary information, except when the Company authorizes disclosures or as required by laws, regulations, or legal proceedings.

43.     The director Defendants who are affiliated with 3G violated the Code of Conduct these duties by reporting back to 3G material adverse non-public Kraft Heinz information about the pace and magnitude of Kraft Heinz's brand value erosion and the near term risk of impairment of values thereof which the director Defendant affiliates of 3G knew or should have known 3G could and would use to sell a large block of its stock.

44.     Each officer and director Defendant is liable for the dissemination of disseminating materially false and misleading 10-Qs and 2018 10-K and registration statements. The failure to publicly disclose and honestly report the operating and financial condition of Kraft Heinz enabled 3G and affiliates to sell more than $1.2 *billion* of Kraft Heinz common stock at an artificially inflated  price; and caused investors to purchase Kraft Heinz publicly-traded common stock and bonds at artificially inflated prices as a result of which they are suing Kraft Heinz for billions of dollars in damages.

## SUBSTANTIVE ALLEGATIONS

45.     In February 2013, the public company, H. J. Heinz Company, was acquired by non-public Heinz for $23 billion.  At that time, Heinz was controlled by Berkshire Hathaway Inc. ("Berkshire Hathaway") and an affiliate of Defendant 3G Capital, each of whom beneficially owned approximately 50% of Heinz. On its web-site, Berkshire Hathaway lists Kraft-Heinz as a " subsidiary".

46.     Berkshire Hathaway is a holding company whose subsidiaries are engaged in a number of diverse business activities including insurance businesses, a freight rail transportation business and a group of utility and energy generation and distribution businesses.  3G Capital is a Brazilian-American, private equity firm known for achieving significant cost reduction in companies under its management  by, among other things, implementing  zero-based budgeting at its portfolio companies.  Zero-based budgeting is a process whereby budgets are determined only after all anticipated expenses in a given period have been justified as being necessary, irrespective of what the budget may have been in a prior period.

47.     On March 25, 2015, Kraft announced a $35 billion merger with Heinz, arranged by Berkshire Hathaway and 3G Capital.  The companies heralded the "significant synergy opportunities" that would result from "combining Kraft's brands with Heinz's international platform" while promising to be "fully committed to maintaining an investment grade rating." The resulting company was expected to have a market value of over $80 billion.

48.     Kraft Heinz is one of the largest food and beverage companies in the world with a portfolio of mature brands that include *Heinz, Kraft, ABC, Oscar Mayer, Philadelphia, Classico, Planters, Velveeta, Jell-O, Lunchables, Kool Aid, Maxwell House, Capri Sun, Smart-Ones and Ore-Ida.* The Kraft businesses manufacture and market food and beverage products, including cheese, meats, refreshment beverages, coffee, packaged dinners, refrigerated meals, snack nuts,

dressings, and other grocery products, primarily in the U.S. and Canada. The Heinz businesses manufacture and market an extensive line of food products, including ketchup, condiments and sauces, frozen food, soups, beans and pasta meals, infant nutrition and other food products.

49.     After the Merger, Kraft Heinz was led by 3G executives and partners.  Defendant Hees, a partner at 3G Capital since July 2010, became  CEO of Kraft Heinz upon the closing of the Merger after serving as CEO of Heinz since its formation in June 2013.  Likewise, Defendant Basilio, a partner of 3G Capital since July 2012, became EVP and CFO of Kraft Heinz upon the closing of the Merger after previously serving as CFO of Heinz since its formation in June 2013 and then became U.S. zone President in 2017.  On October 1, 2017, Defendant Knopf, then only 29 years of age, assumed Defendant Basilio's responsibilities and became EVP and CFO of Kraft Heinz.  Defendant Knopf has been a partner of 3G Capital since July 2012 and held various roles at 3G Capital from 2013 to 2015.

50.     Consistent with 3G Capital's philosophy, Kraft Heinz adopted a series of cost reduction initiatives after the merger when integrating the operations of Kraft and Heinz.  These cost-cutting initiatives helped lower costs and drive increases in highly leveraged Kraft Heinz's profitability even though the Company's sales were declining.

51.     From the start in 2015, the Kraft Heinz strategy centered on harsh cost-cutting to create earnings growth.  Defendants knew, or should have known, that, as a result of their cost cutting obsession, company products were being starved of marketing and promotion and research and development funds.  In addition powerful consumer trends were weakening the Company's pricing power and competitive position relative to competitors Costco, Walmart and Amazon products.

52.     Despite the Company's positive public statements, behind the scenes, this high-profile merger with expectations to create long term shareholder value failed to deliver.  **Kraft**

Heinz's operational results have been faltering since late 2016. Sales grew only .3% in 2016 and through the third quarter of 2017 were down 1.8%. Over the preceding two years, Kraft Heinz's cash on hand fell from $3.9 billion to $1.4 billion even as debt increased, including a $1 billion increase in debt through the first three quarters of 2018. This was the result of declining cash flow caused by the trends identified here.

53.     Kraft Heinz's sales declines and brand impairment were the predictable result of 3G's extreme cost cutting and reduction in advertising and marketing budgets. Kraft Heinz has been spending only 2-3% of annual sales revenues on advertising and marketing its brands compared to the industry average of 5% to 10%. By 2018, Kraft Heinz's organic growth (excluding acquisitions) had fallen 1% per year for the three preceding years.

54.     By late 2017, Defendants knew, or recklessly ignored, that 3G's belt-tightening measures had run their course, depleted the Company of valuable resources, marginalized its internal controls, and left Kraft Heinz's iconic brands badly damaged.

55.     In 2017-2018, the Company experienced significant sales declines in its legacy brands, such as Oscar Mayer and Kraft, as the tastes of a new generation of consumers switched to organic brands and small or private label alternatives. Thus, during 2017 and 2018, Defendants knew - or should have known - that the value of the Oscar Mayer trademark was impaired due to declining sales and decreases in market shares. Similarly, Defendants knew - or should have known - that value of the Kraft brand was likewise impaired by lagging sales and market share losses caused by lower priced and e-commerce retailers.

56.     By at least beginning of 2018, Kraft Heinz suffered impairment in the value of its brands significant sales declines and market share losses as consumers shifted to organic and lower priced private label offerings. This dynamic left the Company with little pricing power and commoditized its product categories. While Kraft Heinz's major brands were suffering sales

declines and market share losses, the Company was also experiencing significant supply chain issues and cost inflation. The combination of these factors severely slashed the product margins and profitability of the Company's major brands, causing an impairment in their value.

57.     In February 2018, Warrant Buffett resigned from Kraft Heinz Board of Directors for the stated reason that he wished to travel less. By February 2018, however Kraft Heinz stock price has declined about 30% in the last year to approximately $70 per share. Mr. Buffett was replaced by Defendant Alexandre Van Dame who is reportedly close to 3G's founders and who was on the board of 3G companies, AB InBev and Restaurant Brands.

58.     By April 2018, Defendant Lemann was publicly admitting that Kraft Heinz's business was "being disrupted" as reported in Forbes Editor's Pick, April 30, 2018, Jorge Paulo Lemann Says Era of Disruption In Consumer Brands Caught 3G Capital By Surprise," Antoine Gara.

59.     Further admissions by Defendant Lemann were reported in April 2018 in The Wall Street Journal, where the 3G co-founder, Kraft director and controlling person was quoted:

> "I'm a terrified dinosaur. I've been living in this cozy world of old brands [and] big volumes. You could just focus on being very efficient and you'd be ok all of a sudden we are being disrupted in all ways. If you go to a supermarket, you see hundreds of new brands. In beer, we had the new kinds of beer coming in from all over. We are running to adjust."

60.     In a 2019 in a CNBC interview as reported in a February 25, 2019 Dow Jones News Report, Warren Buffett revealed what afflicted KHC in 2018:

> KHC was losing its bargaining power with retailers due to competition with private label brands such as Costco's "Kirkland." [Mr. Buffett noted how fast and how far KHC had fallen behind Costco]: "So here they are, 100 years plus tons of advertising, built into people's habits and everything else and now Kirkland, a private label brand comes along with only 750 outlets does 50% more business." Mr. Buffett also noted that consumer brands' "ability to price has changed."

61.     Further admissions appeared in a Reuters February 25, 2019 interview Mr. Buffett also acknowledged that Amazon.com Inc., Walmart, Inc. brands were pressuring KHC.  He also said "the ability to price has changed, and that's huge."

62.     Only insiders, and not public investors, could discern the advancing impairment in value because Kraft Heinz's financial reports were notoriously lacking in details as revealed by Wells Fargo analyst John Baumgartner's reported reaction to poor third quarter financial results in November 2018 that Kraft isn't known for "copious financial detail."  Cash flow was the most significant determinant of Kraft Heinz's brands' values.  The investing public could not discern or even estimate the ongoing impairment in value because Kraft Heinz, as reported, made that calculation based on "estimated future annual net cash flows for each reporting unit (including net sales, costs of products sold, SG&A, working capital and capital expenditures) none of which were provided to public investors with the necessary details.

63.     Kraft Heinz supposedly had an established formula for calculating both "fair value" of goodwill and intangible assets and any impairment thereof.  As stated in its 1Q 2018 10-Q, (and repeated in pertinent part in Kraft Heinz 2018 10-K and each subsequent 10-Q), the Company was carrying $44,843 million in goodwill and $53,757 million in intangible assets, stating, in pertinent part, the following:

> We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our 2017 annual impairment test as of April 2, 2017.  As a result of our 2017 annual impairment test, there was no impairment of goodwill. Each of our goodwill reporting units had excess fair value over its carrying value of at least 10% as of April 2, 2017.

> Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.8 billion as of March 31, 2018.  As a majority of our goodwill was recently recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, there was not a significant excess of fair values over carrying values as of April 2, 2017.  We have a risk of future impairment to the extent

that individual reporting unit performance does not meet our projections.  Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future.  No events occurred during the period ended March 31, 2018 that indicated it was more likely than not that our goodwill was impaired.  There were no accumulated impairment losses to goodwill as of March 31, 2018.

\* \* \*

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our 2017 annual impairment test as of April 2, 2017.  As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $49 million in SG&A in the second quarter of 2017.  This loss was due to continued declines in nutritional beverages in India.  The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary.  Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.8 billion as of March 31, 2018.  As a majority of our indefinite-lived intangible assets were recently recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, there was not a significant excess of fair values over carrying values as of April 2, 2017.  We have a risk of future impairment to the extent individual brand performance does not meet our projections.  Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future.  No events occurred during the period ended March 31, 2018 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired.

64.    The 2010 10-Qs stated that the Company had adequate internal controls and complied with SEC regulations, stating in pertinent part:

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive
Officer and Chief Financial Officer, evaluated the effectiveness of
our disclosure controls and procedures as of the end of the period
covered by this report.  Based on that evaluation, the Chief
Executive Officer and Chief Financial Officer concluded that our
disclosure controls and procedures, as of June 30, 2018, were
effective and provided reasonable assurance that the information
required to be disclosed by us in reports filed or submitted under
the Securities Exchange Act of 1934 is (i) recorded, processed,
summarized, and reported within the time periods specified in the
SEC's rules and forms, and (ii) accumulated and communicated to
our management, including the Chief Executive Officer and Chief
Financial Officer, as appropriate to allow timely decisions
regarding required disclosure.

Changes in Internal Control over Financial Reporting

Our Chief Executive Officer and Chief Financial Officer, with
other members of management, evaluated the changes in our
internal control over financial reporting during the three months
ended June 30, 2018.  We determined that there were no changes
in our internal control over financial reporting during the three
months ended June 30, 2018 that have materially affected, or are
reasonably likely to materially affect, our internal control over
financial reporting.

(Emphasis added.)

65.     The 10-Qs stated that its goodwill and intangible assets were calculated using a

variety of factors, stating, in pertinent part, the following:

We test goodwill for impairment at least annually in the second
quarter or when a triggering event occurs.  We performed our 2018
annual impairment test as of April 1, 2018.  As a result of our 2018
annual impairment test, we recognized a non-cash impairment loss
of $164 million in SG&A related to our Australia and New
Zealand reporting unit.  This impairment loss was primarily due to
margin declines in the region.  The goodwill carrying value of this
reporting unit was $509 million prior to its impairment.
Additionally, we noted that four of our 20 reporting units each had
excess fair value over its carrying value of less than 10%.  As of
the impairment test date, the goodwill carrying values associated
with these reporting units were $4.7 billion for Canada Retail,
$424 million for Latin America Exports, $407 million for
Northeast Asia, and $326 million for Southeast Asia.

We generally utilize the discounted cash flow method under the income approach to estimate the fair value of our reporting units. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each reporting unit (including net sales, cost of products sold, SG&A, working capital, and capital expenditures), income tax rates, and a discount rate that appropriately reflects the risk inherent in each future cash flow stream.  We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors.  Estimating the fair value of individual reporting units requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions.  If our current assumptions and estimates, including future annual net cash flows, income tax rates, and discount rates, are not met, or if valuation  factors outside of our control change unfavorably.  The estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future.  Additionally, as a majority of our goodwill was recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorates.

\*\*\*

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.4 billion as of June 30, 2018.  We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our 2018 annual impairment test as of April 1, 2018.  As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $101 million in SG&A in the second quarter of 2018.  This impairment loss was due to net sales and margin declines related to the *Quern* brand in Brazil.  Additionally, as of April 1, 2018, two brands (*ABC* and *Smart Ones*) each had excess fair value over its carrying value of less than 10%.  These brands had an aggregate carrying value of $665 million as of April, 2018.

As a result of our 2017 annual impairment testing, we recognized a noncash impairment loss of $48 million in SG&A in the second

quarter of 2017.  This loss was due to continued declines in nutritional beverages in India.  The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary.

We generally utilize the excess earnings method under the income approach to estimate the fair value of certain of our largest brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each brand (including net sales, cost of products sold, and SG&A), contributory asset charges, income tax considerations, a discount rate that reflects the level of risk associated with the future earnings attributable to the brand, and management's intent to invest in the brand indefinitely.  We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

We generally utilize the relief from royalty method under the income approach to estimate the fair value of our remaining brands.  Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net sales for each brand, royalty rates (as a percentage of revenue that would hypothetically be charged by a licensor of the brand to an unrelated licensee), income tax considerations, a discount rate that reflects the level of risk associated with the future cost savings attributable to the brand, and management's intent to invest in the brand indefinitely.  We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors.  Estimating the fair value of individual indefinite-lived intangible assets requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions.  If our current assumptions and estimates, including future annual net cash flows, royalty rates, contributory asset charges, income tax considerations, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future.  Additionally, as a majority of our indefinite-lived intangible assets were recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those

> amounts are more susceptible to an impairment risk if business
> operating results or macro-economic conditions deteriorate.

66.     Throughout 2018, KHC filed an Annual Report on Form 10-K and three Quarterly Reports on Form 10-Q for the periods ended December 31, 2017, March 31, 2018, June 30, 2018 and September 30, 2018, respectively.  Each of the filings and their respective contents were governed by SEC rules and regulations, including but not limited to "Regulation S-K: Item 303 Requirements" and "Item 503 Requirements."  Those regulations provided:

**Kraft Heinz's Class Period SEC Filings Violate SEC Disclosure Regulations**

67.     Item 8 of Form 10-K and Item 1 of Form 10-Q, via reference to Regulation S-X [17 C.F .R. §210] required Kraft Heinz to file with the SEC financial statements prepared in conformity with Generally Accepted Accounting Principles ("GAAP") during the Class Period. Regulation S-X [17 C.F.R. §210.4-01.(a)(l)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading  and inaccurate.

68.     During the Class Period, the financial statements Kraft Heinz issued to investors and filed with the SEC on Forms 10-K and 10-Q improperly accounted for costs of products sold and intangible asset impairments, including goodwill, were materially misstated, and presented in violation of GAAP.

69.     Item 7 of Form 10-K and Item 2 of Form 10-Q required Kraft Heinz to furnish the information  called for under  Item 303 of Regulation  S-K [17 C.F.R.  §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") during the  Class Period.   In 1989, the  SEC  issued  interpretative  guidance  associated  with  the requirements of Item 303 of Regulation  S-K, which states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment,
> event or uncertainty is both presently known to management and
> reasonably likely to have material effects on the registrant's
> financial condition or results of operation.

70.     The MD&A Kraft Heinz filed with the SEC on Forms 10-K and 10-Q contained materially false and misleading disclosures about the Company's operating performance and failed to disclose material events and uncertainties associated with Kraft Heinz's major brands and internal control weaknesses, which were then known to management and were reasonably likely to have a material effect on the Company's future operating results.

71.     Item 1A of Form 10-K and Form 10-Q required Kraft Heinz to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], *Risk Factors.* Item 503 of Regulation S-K required Kraft Heinz to disclose the most significant matters making an investment in the Company risky.

72.     The Forms 10-K and 10-Q Kraft Heinz filed with the SEC in 2017 and 2018 failed to disclose material risks associated with its major brands and material internal control weaknesses that made an investment in the Company risky.

73.     Item 9A of Form 10-K and Item 4 of Form 10-Q required Kraft Heinz to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures,* and Item  308 of Regulation  S-K [17 C.F.R.  §229.308], *Internal Control over Financial Reporting,* during the Class Period.

**Item 303 Requirements Regulations S-K**

74.     Item 303 imposes an affirmative duty on issuers to disclose "events" or "uncertainties" that will have a material or unfavorable impact on the registrant's future revenue.[1]

75.     Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to

---

[1]        *See*  17 C.F.R. § 229.303(a)(3)(i) & (ii); Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, Exchange Act Release No. 6835 ("S.E.C. Release No. 6835"), 1989 WL 1092885, at *4 (May  18, 1989).

management and reasonably likely to have material effects on the registrant's financial condition or results of operations.[2]  Pursuant to Item 303(a), for a fiscal year, a registrant has an affirmative duty to: (i) describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected; (ii) describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.[3]

76.     Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of such required disclosures include:  "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.[4]  Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information.[5]  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-

---

[2]     *See id.;* 17 C.F.R. § 229.303(a)(3)(ii).

[3]     *See* 17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835,1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

[4]     S.E.C. Release No. 6835, 1989 WL 1092885, at *4.

[5]     *Id.* at *3.

term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition ... with particular emphasis on the registrant's prospects for the future."[6]  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."[7]

**Item 503 Requirements Applicable To Kraft Heinz 2018 Bond Offering Materials**

77.     Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."[8]  Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."[9]  The discussion of risk factors: must be specific to the particular company and its operations and should explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.[10]

78.     Item 503, thus, provides that a registration statement must disclose all known material risks that are "specific to the particular company and its operations."[11]  Item 503(c) warns issuers:  "[d]o not present risks that could apply to any issuer or any offering."[12]

---

[6]      *Id.*; *see* also *id.* at *17.

[7]      *See*  Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

[8]      *See* Offering Reform, S.E.C. Release No. 8501,2004 WL 2610458, at *86 (Nov. 3, 2004).

[9]      17 CFR § 229.503(c).

[10]     Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

[11]     *Id.*

[12]     17 CFR § 229.503(c).

79.     The Registration Statement for the $3 billion bond issue in June 2018 did not comply with the above statutory mandates.

80.     Item 307 of Regulation S-K required Kraft Heinz's Forms 10-K and 10-Q to disclose Defendant Hees's, Basilio's and Knopf's conclusions about the effectiveness of Kraft Heinz's disclosure controls and procedures, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

81.     Defendant caused Kraft Heinz to falsely and misleadingly represent in its Forms 10-K and 10-Qs the existence and extent to which consumer trends away from buying brand products sold by Kraft Heinz in favor of private label substitutes were adversely affecting Kraft Heinz margins, market share, cash flow and brand value and eroding Kraft Heinz brand value and threatened the Company with a material risk of permanent impairment of goodwill and intangible asset value.

82.     Item 308 of Regulation S-K required Kraft Heinz's Forms 10-K and 10-Q during the Class Period to disclose, among other things, Defendant Hees's, Basilio's and/or Knopfs conclusions about the effectiveness of Kraft Heinz's internal control over financial reporting, defined by relevant regulation as:

- The process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions  and dispositions of the assets of the issuer;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

83.     Kraft Heinz falsely and misleadingly represented in its Forms 10-K and 10-Q that its internal controls over financial reporting were operating effectively when, as the Company has now admitted, it operated with material weaknesses.  These materially false and misleading representations were certified by Defendants Hees, Basilio and/or Knopf in 2018.

84.     During 2018, Defendants, but not the investing public knew:

(a)     that Kraft Heinz had been materially overstating the value of certain of its important product lines;

(b)     that Kraft Heinz's  intangible assets, including goodwill, associated with, at least, its Kraft natural cheese, Oscar Mayer cold cuts, U.S. Refrigerated and Canadian retail businesses were materially impaired and Kraft Heinz would need to imminently recognize a material impairment charge;

(c)     that Kraft Heinz had been operating with material weaknesses in its internal controls over financial reporting, including those controls related to the accounting and disclosure of new accounting standards, its cost of products sold, its procurement function, the impairment of goodwill and the impairment of intangible assets; and

(d)     that the risk factor disclosures and MD&A disclosures in filings Kraft Heinz made with the SEC were materially inaccurate and incomplete in failing to disclose the trends that were eroding the value of Kraft Heinz brands throughout 2018.

85.     In October 2018, unbeknownst to investors, Kraft Heinz received a subpoena from the SEC associated with its investigation into Kraft Heinz's accounting policies, procedures, and internal controls over financial reporting.

86.     The damage done to Kraft Heinz was only unveiled to the public when, on February 21, 2019, Kraft Heinz announced its earnings for the fourth quarter of 2018 and disclosed that the Company took an impairment charge of $15.4 billion to lower the carrying amount of goodwill in its U.S. Refrigerated and Canada Retail reporting units and the carrying amount of certain intangible assets, including the Kraft and Oscar Mayer trademarks. The impairment charge resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34. The impairment charges were approximately 13% and 15% of the amount of goodwill and intangible assets respectively which KRAFT HEINZ represented to public investors.

87.     The Company further publicly disclosed, for the first time on February 21, 2019, that Kraft Heinz had received a subpoena from the SEC in October 2018 in relation to the Company's procurement function. As a result of the SEC investigation, the Company conducted its own internal investigation, which resulted in the Company recording a $25 million increase to costs of products sold, damaging the Company's credibility and provoking fears of future accounting adjustments. On the same day, the Company announced a quarterly dividend of $0.40 per share, which represents a 36% reduction from the $0.625 quarterly dividend Kraft Heinz had been paying. This reduction was designed to save the company $1 billion a year to help reduce long-term debt of $30.9 billion.

88.     As a result of these disclosures, the price of Kraft Heinz common stock plummeted over 27% from $48.18 per share to $34.95per share, erasing more than $16 billion of the Company's market capitalization on extremely heavy trading volume.

89.     In an interview reported by Reuters on February 25, 2019 "Warren Buffett Says Berkshire Overpaid For Kraft Heinz," Mr. Buffett observed the market reacted "probably quite properly" to the news.  In an interview reported on Dow Jones News on February 25, 2019 Mr. Buffett said he wouldn't buy more Kraft Heinz for Berkshire Hathaway "because it isn't worth as much."

90.     Prior to the disclosure of the adverse facts detailed above, in August 2018, 3G Global Food Holdings sold more than $1.2 *billion* of Kraft Heinz common stock at an artificially inflated price.

**Defendants Breached Their Duties And Harmed The Company**

91.     A company A company like Kraft Heinz can suffer real "reputational damage" from a prolonged period of artificially inflated stock that is significantly greater that any regulatory fines or other penalties that it may occur.  See Jonathan M. Karloff, D. Scott Lee and Gerald S. Martin, The Cost to Firms of Cooking the Books, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008).  In fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system" and "[f]or each dollar that a firm misleadingly inflated its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08. . . . [of which] $2.71 is due to lost reputation."  Id. (emphasis added).  This reputational damage increases the longer the public company' stock is artificially high.  Id.

92.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to Kraft Heinz and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the control, management, and administration of the affairs of Kraft Heinz, as well as in the use and preservation of its property and assets.  As explained herein, the conduct of the Defendants complained of herein involves a knowing and culpable violation of

32

their obligations as directors and officers of Kraft Heinz, the absence of good faith on their part, and a reckless disregard for their duties to Kraft Heinz and its shareholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company.

93.     Defendants breached their fiduciary duties by failing to heed numerous, obvious red flags of inaccurate financial statements and inadequate financial controls and by failing to ensure that policies and procedures were in place to ensure the Kraft Heinz insiders were not unjustly enriched with stock sales at inflated prices while in possession of material adverse non-public information and failing to implement policies, procedures and internal controls sufficient to insure that the Company was in compliance with all applicable laws and regulations.

94.     As a result of the Defendants' breaches, detailed herein, the Company has become the subject of shareholder lawsuits and SEC investigations. Kraft Heinz is exposed to potentially massive liability in shareholder suits and eventually bondholder suits arising out of its $3 billion bond offering in June 2018.

## Demand Futility

95.     At the time of this filing, the Company's Board of Directors had eleven members. A majority cannot exercise independent judgment as to a shareholder demand and/or are dominated or are loyal to the inside trading Defendant 3G. Two of those members, Zoghbi and Cahill are, essentially employees of Kraft Heinz and Kraft Heinz itself has designated them as or at – "independent" in Kraft Heinz's annual proxy. Three other directors, Telles, Lemann and Behring are co-founders/partners of the inside trader, 3G. Director Van Damme has been described as "close" to 3G and has been a long-time director of other companies in which 3G is a major shareholder including Restaurant Brands and InBev. Directors Abel and Cool are employees of Berkshire Hathaway which is a major partner with 3G in investments other than Kraft Heinz and whose chairman Warren Buffett has publicly stated that he wants Berkshire

Hathaway to do more deals with 3G.  Demand is excused as to a majority of Kraft Heinz Board members.

96.    In May 2013, the New York Times, in an article on Kraft Heinz discussing the operation of the company, noted "3G is closely held, and their partner – including Kraft Heinz's chief executive officer, Bernardo Hees – takes a hands-on approach to managing their investments."  Bernardo Hees of Kraft Heinz:  "New Mistakes Are Welcome," The New York Times, May 3, 2018, David Gilles.

97.    It was reported in 2015 that Lemann, then 75 had "handed over daily operations of 3G to a handful of associates, including Defendant Behring."

98.    Demand would be futile in this action for the claims asserted herein because a majority of the Company's board is employed by or beholden to Kraft Heinz or 3G Capital and thus incapable of rendering independent judgment with respect to a suit against 3G and Kraft Heinz's officers and directors.

99.    In 2013, 3G and Berkshire Hathaway teamed up to take Heinz private in a $23 billion deal.  In SEC filings, Kraft Heinz has admitted that Berkshire Hathaway and 3G have "substantial control" of Kraft Heinz and "may have conflict of interests" between them and Kraft Heinz.

100.    When the Kraft Heinz deal closed Mr. Buffett was reported to have said in an interview:  "We [Berkshire Hathaway] may increase our ownership if any members of the 3G Group ultimately want to sell out later."

101.    In 2014 Berkshire Hathaway loaned 3G $3 billion to finance Burger King's acquisition of Canadian restaurant chain Tim Horton's.

102.    In 2015, The New York Times quoted Warren Buffett about his 3G partners:  "I knew they were wonderful going into the Heinz deal."  "In terms of ability, in terms of integrity,

every aspect of it.  3G has been a perfect partner."  (*See*, "3G Capital, Warren Buffett's Favorite Partner in Deals worth Billions.")  The author of the article noted that Berkshire Hathaway's Warren Buffett and 3G's founder, Jorge Paulo Lemann, have known each other for "decades" and "the two men have grown close."

103.    Berkshire Hathaway Chairman Warren Buffett has repeatedly expressed a desire and willingness to partner with 3G on more investments.  That public posture, asserted repeatedly, compels the conclusion that Berkshire Hathaway affiliated Kraft Heinz directors will not take any action against 3G or its designated directors.  On February 27, 2015, in his annual letter to shareholders Warren Buffett wrote about 3G:

> Two years ago my friend, Jorge Paulo Lemann, asked Berkshire to join his 3G Capital group in the acquisition of Heinz.  My affirmative response was a no brainer.  I knew immediately that this partnership would work well from both a personal and financial standpoint.  And it most definitely has.
>
> . . . .
>
> We expect to partner with 3G in more activities . . . . Our favored arrangement, however, will usually be to link up as a permanent equity partner (who is some cases, contributes to the financing of the deal as well).  Whatever the structure, we feel good when working with Jorge Paulo.

104.    In his 2016 letter to shareholders Mr. Buffett wrote about 3G and the Kraft Heinz mergers:

> Jorge Paulo and his associates could not be better partners.
>
> . . . We will also look for opportunities to partner with Jorge Paulo, either as a financing partner, as was the case when his group purchased Tim Horton's, or as a combined equity-and-financing partner, as at Heinz.

105.    On March 7, 2017, The New York times quoted Warren Buffett praising 3G: "Jorge Paulo and his associates could not be better partners."  The New York Times, Deal Professor, "Can 3G Capital Keep Thriving On Acquisitions and Cost Cutting?"  Steven David

Solomon.  Even after Kraft Heinz stock price feel to approximately $30 per share after the February 2019 disclosures of material brand value erosion and internal control issues and SEC subpoenas, <u>Buffett defended 3G founder Lemann publicly calling him an "outstanding human being" and said he would "absolutely continue doing business with him."</u>

106.    As a result of the relationships between and among Berkshire Hathaway and 3G they may be deemed to be a "group" for the purpose of Section 13(d) of the Exchange Act. Berkshire Hathaway and 3G were deemed a group because of their agreement to acquire, hold and/or dispose of Kraft Heinz stock.  *See* Section 13(d)(3) Exchange Act.  In addition all Kraft Heinz directors face substantial liability under Section 11 of the Securities Act of 1933 for signing materially misleading and false Registration Statements.   Under that statute, the Individual Defendants herein have limited defenses to liability.   Accordingly, these directors would not want to authorize an insider trading suit against 3G, Lemann, Telles or Behring because such suit could uncover facts exposing all director Defendants to Section 11 liability potentially for hundreds of millions of dollars.  Accordingly, the Berkshire Hathaway affiliated directors on the Kraft Heinz board cannot exercise independent judgment as to whether to institute suit against 3G because to do so might risk implicating their employer, Berkshire Hathaway in liability for 3G's insider trading.

107.    Demand is further excused because the Director Defendants face a substantial likelihood of liability for the claims herein.

108.    Defendants were charged with assisting the Board related to Kraft Heinz financial statements and the accuracy of disclosures to shareholders.  The Audit Committee members, Defendants Dewan, Pope and Jackson was obligated to review and approve the Company's materially false and misleading annual Forms 10-K and quarterly Forms 10-Q, other Company filings, as well as the Company's earnings press releases during the Relevant Period.  However,

the Audit Committee failed properly executes their duties, Kraft Heinz's Audit Committee caused the Company to make materially false and misleading information regarding Kraft Heinz internal controls.  As such, such Audit Committee Defendants face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, and other illegal acts.

109.    Directors associated with 3G are interested and not independent because 3G realized unlawful insider selling proceeds of approximately $600 million from its misuse of inside Company information during the relevant time period.

110.    All the Director Defendants herein failed to ensure that 3G complied with the law with respect to their insider sales.    Thus, the full Board is unable disinterestedly and independently to investigate insider trading allegations against 3G and its founders and controlling persons.

111.    In light of the foregoing facts, the Director Defendants face a substantial likelihood of liability in this case, thus rendering demand on them futile.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### AGAINST THE DIRECTOR DEFENDANTS
### UNDER SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

112.    Plaintiff hereby repeats and realleges each and every allegation above as if fully set forth herein.

113.    Shareholders voting in the 2018 election of directors were provided with a Proxy Statement to inform their vote for directors for the 2018-2019 terms.

114.    The Proxy Defendants caused Kraft Heinz to issue the 2018 Proxy Statement, to solicit shareholder votes for the election of directors.

115.     The inaccuracies and omission in the Proxy Statement concerned matters of material importance to the Company and were material to shareholders in response to the solicitations embodied in each Proxy Statement.  The Proxy Statements were an essential link in Defendants' conscious disregard for Kraft Heinz's best interests as disclosure to the shareholders of the truth would have brought an end to shareholders' endorsement of the Proxy Defendants as fiduciaries.

116.     The Proxy Defendants' failure to include these material facts in the 2018 Proxy Statement rendered the Proxy Statement materially inaccurate and incomplete, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

117.     As a direct and proximate result of the issuance of materially inaccurate and incomplete Proxy Statements, Kraft Heinz suffered direct and significant damages.

118.     Had shareholders been fully informed of the material financial impairment of assets that was due, at least in part to 3G's cost cutting philosophy which starved Kraft Heinz of research and development and marketing resources thus undermining the value of Kraft Heinz major brands, shareholders would likely have voted out all of the 3G affiliate's directors.

119.     In connection with the improper acts alleged under this Count, the Proxy Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

**SECOND CAUSE OF ACTION**

**AGAINST THE DIRECTOR AND OFFICER DEFENDANTS FOR**
**<u>VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5</u>**

120.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.   During the Relevant Period, the Director and Officer Defendants disseminated or approved public statements that were materially false and misleading.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director and Officer Defendants.

122.   As such the Director and Officer Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud; and

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.   As a result of the Director and Officers Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

### THIRD CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
### (AGAINST THE INDIVIDUAL DEFENDANTS)

124.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.   The Individual Defendants owed the Company a fiduciary duty and obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry and supervision.  The Individual Defendants breached these fiduciary duties.

126.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent

business judgment to protect and promote the Company's corporate interests.

127.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Kraft Heinz has sustained significant damages.

**FOURTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY FOR INSIDER
SELLING AND MISAPPROPRIATION OF MATERIAL, NON-PUBLIC
INFORMATION AGAINST 3G AND FOR AIDING AND ABETTING
THEREOF AGENT DEFENDANTS LEMANN, TELLES AND BEHRING**

128.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as through fully set forth herein.

129.   The Kraft Heinz Company Employee Code of Conduct contains prohibitions, restrictions and guidelines on insider trading that are applicable to directors:

> Never buy or sell Company securities . . . when you possess inside information or during trading blackout periods.
>
> . . . .
>
> Don't disclose inside information to anyone outside the Company (including family members of friends) for any reason.  If that person uses this information to trade in the stock market, you are legally responsible for tipping that person.

130.   The Employee Code of Conduct specifically addressed "directors" and "waivers" of compliance with the Code:

> WAIVERS
>
> While all of us are expected to uphold our Code at all times, the Company understands that, in rare circumstances, a waiver of the Code might be necessary.  Such waivers are granted on a case by case basis and are only appropriate when strict adherence to the Code could cause significant hardship.
>
> Any waiver or amendment of this Code for the Chief Executive Officer, General Counsel, Chief Financial Officer, Global Controller, other senior financial or executive officers or directors must be approved by the Board of Directors.

131. During the Relevant Period, Defendants 3G Capital (the "Selling Defendants") sold Kraft Heinz stock, while they knew the material information described above, and sold Kraft Heinz stock on the basis of such information.

132. 3G's sale of $1.2 billion of Kraft Heinz stock is significant because it represents approximately 13% of 3G's original investment in Kraft Heinz.  In 2013, 3G invested $4 million of its cash in the Heinz takeover and an additional $5 billion.  It was 3G's first sale of Kraft Heinz securities since the merger.  Traditionally, 3G has not sold any portion of its major holdings in many years; 3G's last sale of Restaurant Brands International stock occurred in 2015.

133. The material information described above was proprietary, non-public information concerning the Company's business and financial condition.  It was a proprietary asset belongs to the Company, which the Selling Defendants used for their own benefit when they sold Kraft Heinz stock.

134. Since using the Company's proprietary information for their own gain constitutes a breach of the Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

(a)     Determining that this action is a proper derivative action maintainable under law and demand is excused;

(b)     Awarding, against all Defendants and in favor of Kraft Heinz, the damages sustained by the Company as a result of Defendants' breach of fiduciary and contractual duties;

(c)     Awarding to Kraft Heinz restitution from 3G, and from each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by 3G from its insider trading;

(d) An Order invalidating the election of directors to the Board pursuant to the 2018 Proxy Statement;

(e) Directing Kraft Heinz to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

(f) Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 16, 2019

Respectfully submitted,

STANLEY M. STEIN, P.C.

By: _/s/ Stanley M. Stein_____
        Stanley M. Stein, Esquire
        Pa ID # 10577
        445 Ft. Pitt Blvd.
        Suite 150
        Pittsburgh, PA 15219
        412-904-4573 (p)
        412-904-4726 (f)
        smstein@smsteinlaw.com

By: _/s/ George C. Thompson_____
        George C. Thompson
        Pa ID # 316626
        445 Ft. Pitt Blvd., Suite 150
        Pittsburgh, PA 15219
        412-904-3126 (p)
        412-904-4726 (f)
        gcthompson@smsteinlaw.com